**ORIGINAL**

1

**THE ROSEN LAW FIRM, P.A.**
2   Laurence M. Rosen, Esq. (CSB# 219683)
    333 South Grand Avenue, 25th Floor
3   Los Angeles, CA 90071
    Telephone: (213) 785-2610
4   Facsimile: (213) 226-4684
    lrosen@rosenlegal.com
5

6
    Attorneys for Plaintiffs
7

8              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
9

10

11  THEODORE DEAN, SLAVA VANOUS,        CASE No.: 11-CV- 01331
    CLAIR HARPSTER, RANDOLPH                    (RGK) (PJWx)
12  DANIELS-KOLIN AND TAN TEE YONG
    INDIVIDUALLY AND ON BEHALF OF
13  ALL OTHERS SIMILARLY SITUATED,      AMENDED COMPLAINT

14              Plaintiffs,
15                                       CLASS ACTION

16              vs.

17                                       **JURY TRIAL**
    CHINA AGRITECH, INC., YU CHANG,      **DEMANDED**
18  YAU-SING TANG, GENE MICHAEL
    BENNETT, XIAO RONG TENG, MING
19  FANG ZHU, ZHENG "ANNE" WANG,
    CHARLES LAW, LUN ZHANG DAI, HAI
20  LIN ZHANG, RODMAN & RENSHAW,
    LLP AND CROWE HORWATH LLP,
21

22              Defendants.
23

24

25       1.    Plaintiffs Theodore Dean, Slava Vanous, Clair Harpster, Randolph
26  Daniels-Kolin and Tan Tee Yong ("Plaintiffs") individually and on behalf of all
27  other persons similarly situated, by their undersigned attorneys, allege in this
28

1

Amended Complaint (the "Complaint") the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by China Agritech, Inc. ("CAGC" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) information readily obtainable on the Internet; (e) interviews of several witnesses with personal knowledge of the relevant facts; (f) investigation of Chinese State Administration of Industry and Commerce ("SAIC") filings; (g) investigation of Chinese State Administration of Taxation ("SAT") filings; and (h) investigation and analysis of companies alleged to be suppliers of the Company.

## I.   NATURE OF THE ACTION

2.   This is a class action on behalf of a class consisting of all persons and entities, other than defendants and their affiliates, who purchased the publicly traded common stock of CAGC between November 12, 2009 through March 11, 2011 (the "Class Period"), seeking to recover damages caused by defendants' violations of federal securities laws (the "Class.").

3.   This Complaint alleges claims for violations of §10(b) and §20(a) of the Securities Exchange Act of 1934 on behalf of all Class members.  No §10(b) or §20(a) claims are asserted against defendants Rodman & Renshaw or Crowe Horwath.

4.   This Complaint also alleges claims under §11 and §15 of the Securities Act of 1933 on behalf of all Class members that purchased shares of CAGC in or pursuant to CAGC's secondary public offering of common stock on approximately May 4, 2010 at $16.10/share.

5.    CAGC is a holding company. Its business operations are primarily conducted through its direct and indirect subsidiaries in the People's Republic of China ("PRC"). It purports to manufacture and sell organic compound fertilizers and related agricultural products.

6.    During the Class Period, CAGC and its officers and directors engaged in a wide-ranging fraud including:

- Overstating revenue by at least 900% for fiscal 2009 and 1,444% for fiscal 2008.
- Reporting $76.13 million of revenue in 2009 and $45.24 million in 2008, when the true revenue figures were not more than $7.6 million in 2009 and $3.0 million in 2008.
- Overstating net income by at least 536% for fiscal 2009. Reporting a profit for fiscal 2008, while the Company was in fact losing money.
- Reporting $6.17 million of net income in 2009 and $9.83 million in 2008, when the true net income figures were not more than $0.97 million in 2009 and a net loss of ($1.88) million in 2008.
- Failing to disclose material related party transactions - CAGC signed a contract effective December 8, 2008 to pay a company controlled by its CEO Chang approximately $4.0 million for raw materials.
- CAGC has maintained two materially different sets of financial accounts, one for investors that it files with the SEC and one for its true business operations that it provides to the Chinese government showing revenue and income only a tiny fraction of that reported to the SEC and investors.

7.    During the Class period when CAGC was issuing false and misleading financial statements, Defendants Teng, Tang and Zhu sold over $3.0 million of CAGC stock and CAGC sold over $20.0 million in a public offering.

8.      Then on March 14, 2011, CAGC's auditors Ernst & Young Hua Ming ("E & Y") stated that they are not able to rely on management's representations any longer.

9.      The same day E &Y's role as auditor was terminated, Nasdaq delisted and halted trading in CAGC's stock "in order to protect the public interest."

10.     In the wake of the scandal, two of CAGC's directors and its COO have resigned.

11.     As of the date of this amended complaint, CAGC still has not filed its annual report for 2010 on Form10-K with the SEC, which was originally due on April 15, 2011.

12.     CAGC's false statements have caused investors substantial losses as its shares have dropped from $10.78/share to $1.55/share as a result of defendants' violations of the securities laws.

## II.    JURISDICTION AND VENUE

13.     The Securities Exchange Act claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

14.     The Securities Act claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l and 77(o)).

15.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), Section 22(a) of the Securities Act, 15 U.S.C. §77v(a), and 28 U.S.C. § 1331.

16.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), 28 U.S.C. § 1391(b), 28 U.S.C. § 1391(d), and Section 22(a) of the Securities Act (15 U.S.C. §77v(a)).

17.   In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.   PARTIES

18.   Plaintiffs Theodore Dean, Tan Tee Yong, Slava Vanous, Clair Harpster, and Randolph Daniels-Kolin purchased CAGC common stock during the Class Period and have suffered damages as a result. Tan Tee Yong's PSLRA Certification is attached hereto. The PSLRA Certifications of the other plaintiffs have previously been filed with the Court and are incorporated herein by reference.

19.   Defendant CAGC is a Delaware corporation with its principal executive offices located at Room 3F, No. 11 Building, Zhonghong International Business Garden, Future Business Center, Chaoyang North Road, Chaoyang District, Beijing, China 100024.   A CAGC subsidiary maintains an office in California.

20.   CAGC, through its subsidiaries, purports to manufacture and sell organic compound fertilizers and related agricultural products in the PRC.

21.   To have its stock publicly traded in the United States, CAGC employed a device called a "reverse merger" in 2005. In a reverse merger, a publicly traded shell company acquires the private company seeking to go public. In exchange, the shareholders of the former private company receive a controlling share of the public company.

22.   As a result of the reverse merger, CAGC became a holding company that primarily operates through its subsidiaries in the PRC.

23.   Defendant Yu Chang ("Chang") was and is the Company's CEO, President, Secretary and Chairman of the Board at all relevant times. In addition, Defendant Chang was a substantial shareholder of the Company throughout the

Class Period. When the Company filed its 2008 10-K and 2009 10-K, Defendant Chang owned 41.96% and 40.23% of the Company's stock, respectively.

24.     Defendant Yau-Sing Tang ("Tang") was and is the Company's CFO and Controller from October 2008 through the present. In addition, Defendant Tang was a shareholder of the Company throughout the Class Period. When the Company filed its 2008 10-K and 2009 10-K, Defendant Tang owned 1.04% and 0.4% of the Company's stock, respectively.

25.     Defendant Gene Michael Bennett ("Bennett") was and is a director of CAGC from October 2008 through the present. At all times during the Class Period, Bennett was the chair of CAGC's audit committee, as well as a member of CAGC's Nominating and Governance Committee. After the CAGC Defendants' fraud was disclosed, Bennett was the head of the Company's Special Committee investigating the allegations of fraud.

26.     Defendant Xiao Rong Teng ("Teng") was and is a director of CAGC at all relevant times. Teng also served as the Company's COO from February 2005 to March 2009. In addition, Teng was a substantial shareholder of the Company throughout the Class Period. When the Company filed its 2008 10-K and 2009 10-K, Teng owned 2.53% and 2.15% of the Company's stock, respectively.

27.     Defendant Ming Fang Zhu ("Zhu") was and is CAGC's Chief Operating Officer from March 2009. From April 2007 to March 2009, Zhu served as President of Beijing Agritech Fertilizer Co, Ltd., an indirect subsidiary of the Company.

28.     Defendant Lun Zhang Dai ("Dai") was and is a director of CAGC at all relevant times. Dai also serves as a member of the Company's Audit Committee, Compensation Committee and Nominating and Governance Committee.

29.     Defendant Hai Lin Zhang ("Zhang") was and is a director of CAGC from October 2008. Zhang also serves as a member of the Company's Audit

Committee, Compensation Committee and Nominating and Governance Committee.

30. Defendant Charles Law ("Law") was a director of CAGC from January, 2010. According to the Company's SEC filings, Law is a qualified U.S. attorney who has an understanding of SEC compliance requirements.

31. Defendant Zheng "Anne" Wang ("Wang") was a director of CAGC from December 2009. Wang has been Vice-President of Carlyle Asia Growth Capital, a subsidiary of the Carlyle Group ("Carlyle"), since December 2007. According to the Company's SEC filings, Wang was Carlyle's designee to CAGC's board and was determined by the Board of Directors not to be an "independent director."

32. Chang, Tang, Bennett, Teng, Zhu, Dai, Zhang, Law, Wang are collectively referred to hereinafter as the "Individual Defendants."

33. Rodman & Renshaw, LLC ("Rodman") is a broker-dealer who served as the underwriter of a secondary public offering of $20.0 million of CAGC stock that was completed on or about May 4, 2010 (the "Offering"). As the underwriter for the Offering Rodman was obligated to conduct due diligence to ensure that CAGC and its business was as presented to investors in the Registration Statement and Prospectus for the Offering. Rodman was negligent in conducting due diligence on CAGC for the Offering.

34. Crowe Horwath LLP ("Crowe") served as CAGC's independent auditors and certified the accuracy of CAGC's financial statements for fiscal years 2008 and 2009. Crowe consented to including its certification of CAGC's financial statements in the Registration Statement and Prospectus for the Offering. Crowe was negligent in certifying CAGC's fiscal 2008 and 2009 financial statements as accurate, and permitting them to be included in the Registration Statement and Prospectus when CAGC's financial statements were in fact materially misstated.

35.   No allegations of fraud are alleged against Rodman or Crowe. Plaintiffs do not intend any part of this Complaint to allege that Rodman or Crowe acted with fraudulent intent or that they committed fraud.

## **The Audit Committee**

36.   According to the Company's audit committee charter, members of the audit committee have the responsibility to, among other things:

> a. ".... (a) assists the Board's oversight of (i) the integrity of the Company's financial reporting process and system of internal controls...";
> b. "Review and discuss with management and the independent auditors, before filing with the Securities and Exchange Commission, the annual audited financial statements and quarterly financial statements. Review with the independent auditors and management the results of the audit and the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations.- Discuss matters required to be communicated to Audit Committee in accordance with Statement on Auditing Standards No. 61."; and
> c. "With the independent auditors, management and the internal auditors, periodically review and discuss significant (a) financial reporting issues and practices, and critical accounting policies and estimates. (b) issues regarding accounting principles and financial statement presentation (including any significant changes in the Company's selection or application of accounting principles). and (c) issues as to the adequacy of the Company's internal control systems and compliance with applicable laws and regulations. Assess management's attitude toward internal controls, the process for establishing and monitoring internal control systems and any special audit steps adopted in light of material control deficiencies."

37.   According to CAGC's 2009 10-K, the audit committee was comprised of Defendant Bennett, Dai and Zhang, with Bennett serving as the Chairman.

8

Bennett was also determined by the board of directors to be the necessary audit committee member that qualifies as an "audit committee financial expert".

38.   Defendant Bennett, Dai and Zhang as members of the audit committee had an affirmative duty of oversight and responsibility for the integrity of CAGC's financial reporting.

## CAGC's Code of Ethics Acknowledges Related Party Transactions Should be Avoided

39.   The Company's Code of Ethics – which CAGC's officers and directors presumably promised to adhere to - prohibits self-dealing transaction such as those engaged in by defendant CEO Chang:

> "The chief executive officer, chief financial officer, comptroller, chief accounting officer or persons performing similar functions (collectively, "Senior Financial Officers") hold an important and elevated role in corporate governance. Senior Financial Officers fulfill this responsibility by prescribing and enforcing the policies and procedures employed in the operation of the enterprise's financial organization, and by demonstrating the following:

> I. Honest and Ethical Conduct
> Senior Financial Officers will exhibit and promote the highest standards of honest and ethical conduct through the establishment and operation of policies and procedures that:
> • ....
> • **Prohibit and eliminate the appearance or occurrence of conflicts between what is in the best interest of the enterprise and what could result in material personal gain for a member of the financial organization, including Senior Financial Officers.".**

> [Emphasis added.]

**Respondeat Superior Liability**

40.   CAGC is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency, as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

41.   The *scienter* of the Individual Defendants and other employees and agents of the Company is similarly imputed to CAGC under *respondeat superior* and agency principles.

## IV.   DEFENDANTS' MATERIAL OMMISSIONS AND MISREPRESENTATIONS

### A. The 2009 Q3 10-Q is False and Materially Misstated

42.   The Class period begins on November 12, 2009 when the Company filed with the SEC its report for the third quarter of 2009 on Form 10-Q ("2009 Q3 10-Q") containing false and misleading financial statements.

43.   The false and misleading 10-Q was signed by defendants Chang and Tang. Chang and Tang also signed the accompanying Sarbanes-Oxley ("SOX") certifications, attesting to the accuracy of CAGC's financial statements.

44.   The 2009 Q3 10-Q was false because it materially misstated CAGC's revenue and net income for the quarter.

45.   According to CAGC's SEC filings, in 2009 CAGC had four operating subsidiaries located in the PRC: Beijing Agritech, Pacific Dragon, Anhui Agritech, and Xinjiang Agritech.

46.   Plaintiffs' counsel obtained financial statements filed by the four subsidiaries with both the PRC State Administration for Industry and Commerce ("SAIC")[1] and PRC State Administration of Taxation ("SAT")[2].

---

[1] The SAIC (State Administration for Industry and Commerce) is the Chinese government body that regulates industry and commerce in China. It is primarily

47. The consolidated financials reported by CAGC with the SAIC and SAT for *entire fiscal year* 2009 are substantially similar to each other, and both report revenue and income that are substantially less than the revenue and income CAGC reported in the 2009 Q3 10-Q with the SEC.

| (in USD) Million | SEC Nine Months Ended Sept 30, 2009 | SAIC for Entire fiscal year 2009 | SAT for Entire Fiscal Year 2009 |
|---|---|---|---|
| Net Revenue | $55.38 | $7.02 | $7.59 |
| Net Income | $12.83 | $0.97 | $0.93 |

48. The financial statements filed by CAGC with the two PRC government authorities indicate the true financial performance of the Company because.

- Under PRC law, penalties for filing false SAIC filings include fines and revocation of the entity's business license.[3]
- If an entity's business license is revoked, the People's Bank of China[4] requires all bank accounts of that entity be closed.[5]
- Without a business license the entity cannot legally conduct any business.
- Under PRC law, filing false tax documents is a crime subject to severe criminal and civil penalties, including imprisonment.[6]

---

responsible for business registrations, issuing and renewing business licenses and acts as the government supervisor of corporations. All Chinese companies are required to file financial statements with the Chinese government annually or bi-annually.

[2] The SAT (State Administration of Taxation) is PRC equivalent of the Internal Revenue Service in the U.S.

[3] "Measures for the Annual Inspection of Enterprises" issued on February 24, 2006, Article 20.

[4] People's Bank of China in PRC is equivalent to the Federal Reserve in the U.S.

[5] "Measures for the Administration of RMB Bank Settlement Accounts" issued in April 2003. (No.5 [2003]), Article 49.

- The financial statements CAGC filed in the PRC with the SAIC are all audited by CPA firms.[7]

49.    Therefore, CAGC's 2009 Q3 10-Q is false and materially misleading.

## B. CAGC's 2009 10-K is False and Materially Misstated

50.    On April 1, 2010, the Company issued its fiscal 2009 annual report on form 10-K ("2009 10-K") containing false and misleading financial statements for fiscal years 2008 and 2009.

51.    The false and misleading 2009 10-K was signed by defendants Chang, Tang, Teng, Bennett, Dai, Zhang, Law and Wang. Defendants Chang and Tang signed the accompanying SOX certifications, attesting to the accuracy of CAGC's financial statements.

52.    The 2009 10-K was false and materially misstated because: i) It materially misstated the Company's revenue and net income for fiscal year 2008 and 2009; and ii) It concealed material related party transactions.

### i.    CAGC Kept Two Materially Different Sets of Books: The Financial Statements CAGC Filed with Chinese Authorities Report a Tiny Fraction of the Revenue and Income contained in the Financial Statements CAGC Filed

---

[6]    Article 201 of the Criminal Law of PRC; Article 63 of the Law of PRC Concerning the Administration of Tax Collection.

[7]    Beijing Agritech's 2008 and 2009 financial statements are audited by Beijing Zhonghui Xincheng CPA Firm. Pacific Dragon's 2008 and 2009 financial statements are audited by Heilongjiang Huaxin CPA Firm. Xinjiang Agritech's 2008 and 2009 financial statements are audited by Xinjiang Runtong CPA Firm. Anhui Agritech's 2008 and 2009 financial statements are audited by Bengbu Tianyi CPA Firm.

**with the SEC**

53.    The revenue and net income reported by CAGC with the PRC SAIC and SAT for fiscal 2008 and 2009 are substantially less than those reported by CAGC with the SEC.

54.    For fiscal 2008, the Company reported $45.24 million net revenue and $9.83 net income to the SEC. However, the revenue it reported to the PRC SAIC and SAT was no more than $3 million, with a net loss of more than ($1.88) million.

55.    CAGC overstated revenue by at least 1,444% for fiscal 2008.   It fabricated a profitable fiscal year for 2008 while the Company was in fact losing money.

| (In USD million) | SEC 2008 | SAIC 2008 | SAT 2008 | Amount of Overstatement from SAIC to SEC | SAIC Amount as % of SEC |
|---|---|---|---|---|---|
| Net Revenue | $45.24 | $2.93 | $2.4 | $42.31 | 6.48% |
| Net Income | $9.83 | ($1.88) | ($2.03) | $11.71 | n/a |

56.    For fiscal 2009, the Company reported $76.13 million net revenue and $6.17 net income to the SEC. However, CAGC reported revenue to the PRC SAIC and SAT that was no than $7.6 million, with net income of less than $1 million.

57.    CAGC overstated revenue by at least 900% and overstated net income by at least 536% for fiscal 2009.

| (In USD million) | SEC 2009 | SAIC 2009 | SAT 2009 | Amount of Overstatement from SAIC to SEC | SAIC Amount as % of SEC |
|---|---|---|---|---|---|
| Net Revenue | $76.13 | $7.02 | $7.59 | $69.11 | · 9.22% |
| Net Income | $6.17 | $0.97 | $0.93 | $5.2 | 15.72% |

58.    CAGC's fraudulent revenue reporting has also been verified by Plaintiff's investigators' site visits to CAGC's factories.

59. According to Plaintiffs' investigator, CAGC subsidiary Beijing Agritech is an idle factory with no significant operation.[8]

- Plaintiffs' investigators visited Beijing Agritech's factory in Pinggu, Beijing on a weekday in early June, 2011. The investigators found no evidence of operations at the factory. The door was locked. They did not see any movement of workers or machines through the window. There were no trucks or vehicles entering or exiting.

- When the investigators inquired to the gatekeepers about meeting with or talking to the sales department, they were refused entry to the factory. Nor would the gatekeepers provide any contact information for factory management. The two gatekeepers said currently no officer or manager was in the factory and no one was expected in the factory for another month and that the gatekeepers were currently the only persons in charge of the whole factory.

- The investigators also visited the local government department that supervises and regulates CAGC's (and that factory's) business. The department is known as the Administrative Committee of Beijing Xinggu Economic Development Zone. This is the government administrative organ that has responsibility for overall management of the economic zone in which CAGC's factory resides.[9] Plaintiffs' investigator interviewed Mr. Yin, the director of Investment Invitation Section I under

---

[8] Though CAGC did not disclose in its SEC filings about annual production of Beijing Agritech, it did confirm in its February 10, 2011 Letter to Shareholders that the factory in Beijing is fully operational.

[9] The Administrative Committee's duties include, but are not limited to, planning and overseeing the economic zone's construction and development, investment and business start-ups, coordination between the various departments for serving the business development, and daily supervision of enterprises that are operating in the zone. Thus the committee usually keeps the most comprehensive information of all enterprises operating in the zone.

14

the Administrative Committee, and was told by him that Beijing Agritech rarely has any production. Its gate is locked all the time. The management has refused the Administrative Committee's several requests for routine site visits. Mr. Yin was also told by Beijing Agritech that this factory was not in operation.

60.    For Anhui Agritech, CAGC released more than 10 pictures inside the factory in February 2011, in an effort to rebut the negative facts in the LM Report. Those pictures, however, show that the company did not have basic equipment, such as forklifts, necessary for operations. One picture showed that human laborers were used to move the 40kg (88lb.) fertilizer bags manually. Since this factory was reported to manufacture 100,000 tons of granular fertilizer annually, it means 37 workers have to move 2.5 million bags weighing 40kg each year (185 bags/day per person assuming they work 365 days a year), an impossible method of operation. [10]

61.    As to Xinjiang Agritech, it was not incorporated until December 2008. According to LM Report, the Xinjiang Agritech plant is actually a warehouse, shared with two other companies and demonstrates no activity.

62.    In summary, CAGC materially overstated it production.

63.    In addition, financial statements filed by CAGC subsidiary Pacific Dragon with local SAIC show its revenue for 2008 and 2009 was only $76,811 and $85,294, respectively, far less than the purported annual rent stated in SEC filed financial statements in $518,940.

64.    It is a common sense that no company would spend six times its revenue for rent expenses.

65.    Similarly, the financial statements filed by CAGC subsidiary Anhui Agritech with the local SAIC show its revenue for 2009 was only $77,941, far less than the purported annual rent of $432,900 reported in CAGC's SEC filings.

---

[10] An educated estimate based on CAGC's total employees and production capacity of each subsidiary. This assumes a bag is moved only once following production.

66. As shown by the discrepancy between the PRC SAIC revenue, income and expenses, CAGC has been keeping two materially different sets of books, one for the PRC authorities and one for the SEC.

### ii. Related Party Transactions

67. The 2009 10-K was false and misleading also because it concealed related party transactions with CAGC's CEO Chang.

68. CAGC's third largest supplier - Shenzhen Hongchou Technology Company Ltd. ("Shenzhen Hongchou") was 90% owned by CAGC CEO, President, Secretary and Chairman of the Board Defendant Chang at all relevant times until at least January 5, 2011, when he claims to have transferred his shares to another individual Haibo Li.[11]

69. Generally Accepted Accounting Principles ("GAAP"), Statement of Financial Accounting Standards ("SFAS") and SEC regulations required the Company to disclose all material related party transactions.

70. Statement of Financial Accounting Standards ("SFAS") No. 57 and No. 850 provide that a public company's "[f]inancial statements shall include disclosures of material related party transactions." SFAS No. 57 ¶ 2; 850-10-50-1.

71. "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." SFAS No. 57 ¶ 1; 850-10-05-3. "Affiliate" includes any company that is under common control or management with the public company. SFAS No. 57 ¶ 24(a, b); 850-10-20.

72. Disclosures of related party transactions shall include (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an

---

[11] Perhaps not coincidentally, Ms. Haibo Li's mother is the owner of Harbin Hai Heng Chemical Dist. Co., another principal supplier to CAGC (supplying 17% of CAGC's raw materials).

understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. SFAS No. 57 ¶ 2; 850-10-50-1.

73.     In its May 14, 2009 10-Q, CAGC attached a contract dated December 8, 2009 between CAGC's subsidiary Pacific Dragon Fertilizer Co., Ltd. and Shenzhen Hongchou in which CAGC's subsidiary promised to purchase 26.9 million RMB ($4.0 million) of raw materials from Shenzhen Hongchou. [12]

74.     According to the 2009 10-K, CAGC purchased 15% and 12% of its raw materials from Shenzhen Hongchou in fiscal 2009 and 2008.

75.     CAGC, however, did not disclose that 90% of Shenzhen Hongchou's shares were owned by CAGC CEO, President, Secretary and Chairman defendant Chang and that the above purchases were related party transactions.

76.     Shenzhen Hongchou's SAIC filings show that Chang has owned 90% of its shares since August, 2004, while Ms. Haibo Li owned the remaining 10%.

77.     In addition, Haibo Li's sister is a branch manager for Pacfic Dragon, the CAGC subsidiary that signed the related party contract with Shenzhen Hongchou.

78.     The SAIC filings also show that Shenzhen Hongchou's annual revenue was only $4,822.00 (RMB 33,269.23) in fiscal 2008, substantially less than CAGC's purported purchases from it.

79.     Notably, CAGC reported in the 2009 10-K that "We purchase the majority of our raw materials from suppliers located in the PRC and use suppliers that are located in close proximity to our manufacturing facilities, which helps us to contain our cost of revenue." Shenzhen Hongchou, however, is not close to Pacific Dragon Fertilizer Co., Ltd. or to any of CAGC's subsidiaries. The closest CAGC

[12] The contract is attached and incorporated by reference herein.

subsidiary to Shenzhen Hongchou is Anhui Agritech, which is more than 1,300 km (808 miles) away. Pacific Dragon is more than 3,000 km (1,864 miles) from Shenzhen Hongchou.

80.    The only reason for CAGC to choose Shenzhen Hongchou as its major supplier is to personally benefit CEO, President, Secretary and Chairman of the Board defendant Chang.

### iii.   CAGC's Other Suppliers Raise Serious Questions

81.    According to CAGC's 2009 10-K, Beijing Zhongxin Chemical Technology Development Co., ("Beijing Zhongxin") was its largest supplier. CAGC purchased 18% and 33% of its raw materials from it in fiscal years 2009 and 2008, respectively.   On December 2, 2008, CAGC's subsidiary Pacific Dragon Fertilizer Co., Ltd. signed a contract to purchase 59.6 million RMB ($8.7 million) of raw materials (fulvic acid) from Beijing Zhongxin.[13]

- After extensive government database searches and website searches in all possible transliterated Chinese names, Plaintiffs' counsel's investigator could not find such company.[14]  Plaintiffs believe Beijing Zhongxin does not exist or if it does exist in some form, it is a non-operational shell company.

- If Beijing Zhongxin does exist, it should be an important and well-known player in the market for fertilizer raw materials since it has millions of dollars in annual sales. It is unlikely that CAGC is its only customer. Yet,

---

[13]   The contract is attached and incorporated by reference herein.

[14]   LM Report also questioned CAGC's mysterious suppliers because those companies "cannot be found in any directory under possible Chinese names that would correspond to the transliterated names or under the alphabetic names." However, in its response, CAGC still did not disclose the suppliers' Chinese names. It only referred to the link of its SEC filings where only English names were disclosed. It appears defendants did not disclose the Chinese names because one of the suppliers was owned by CEO/Chairman/President Chang and he did not want to be discovered, while the other supplier does not exist.

when Plaintiff's counsel's investigator interviewed managers at Beijing Dahua Fertilizer Co., Ltd. and Beijing Aojia Fertilizer Co., Ltd., two well-known fertilizer manufacturers in Beijing, they stated that they are quite familiar with the industry, but neither of them has ever heard of Beijing Zhongxin.

- Therefore, Plaintiffs' investigator believes that Beijing Zhongxin does not exist and may be a front to siphon funds from CAGC.

82. According to CAGC's 2009 10-K, Harbin Hai Heng Chemical Distribution Co., Ltd., ("Harbin Hai Heng") was its second largest supplier. On December 5, 2008, CAGC's Pacific Dragon subsidiary signed a contract with Harbin Hai Heng to purchase 43.4 million RMB ($6.0 million) of raw materials from Harbin Hai Heng.[15] CAGC purchased 17% and 12% of raw materials from Harbin Hai Heng in fiscal 2009 and 2008, respectively.

- However, Harbin Hai Heng's PRC SAIC records show that this company did not participate in the mandatory annual inspection for fiscal year 2008 and 2009, implying that it has been a non-active business since 2007. Failing to file the annual inspection will not only bring substantial penalties, but also the risk of revocation of the entity's business license.[16] Without a business license, a company cannot conduct any business in the PRC or even maintain a bank account.

- Harbin Hai Heng is a shell company. According to a credit report issued by Qingdao Inter-credit, a reputable credit reporting agency in China, Harbin Hai Heng has no known phone number, no website, no information obtainable online and no determinable business operations.

---

15 The contract is attached and incorporated by reference herein.

[16] PRC "Measures for the Annual Inspection of Enterprises" issued on February 24, 2006, Article 19.

These facts have also been verified by Plaintiffs' investigator through extensive database searches.

- Furthermore, Harbin Hai Heng is owned by Guirong Yin who is the mother of Ms. Haibo Li, Chang's business partner in Shenzhen Hongchou, the third largest supplier of CAGC -- which was 90% owned by Chang until January 2011 when Chang transferred his 90% interest to Haibo Li. Haibo Li's sister is a branch manager for CAGC subsidiary Pacific Dragon which signed the $4.0 million contract with Shenzhen Hongchou. Defendant CEO Chang's full relationship with the Li family is not yet known, but it is clearly deep.

83.     According to CAGC's 2009 10-K, Langfang Tong Chuang Industrial and Trading Company Ltd ("Langfang Tong Chuang") was its fourth largest supplier. CAGC purchased 13% and 11% of its raw materials in 2009 and 2008 year, respectively.

- Langfang Tong Chuang's PRC SAIC records show that this company's business scope is limited to "sales of paper, daily grocery, iron powder, construction materials, steel, auto parts, and plastic products and machining." None of CAGC's reported purchases of nitrogen, phosphorus and kalium or any similar chemical material is included within the scope of allowable business operations.

- According to PRC regulations, a company's registered business scope is determined by its Articles and monitored by local authorities. A company is not allowed to conduct any business beyond the registered scope without amendment to its Articles and SAIC registration, unless specifically approved by the SAIC.[17]

---

[17] Company Law of the People's Republic of China, Article 11.

- Langfang Tong Chuang's SAIC records do not show any approval for the manufacture, sale or distribution of raw materials for fertilizer.
- Furthermore, its SAIC filings show that the company's revenue was $208,370 and $216,350 for the fiscal year 2009 and 2008, respectively,[18] substantially less than CAGC's purported purchase from it.

84. There is no plausible legitimate business explanation for CAGC's payments to Beijing Zhongxin, Harbin Hai Heng and Langfang Tong Chuang as these three purported suppliers clearly did not provide raw materials to CAGC in the amounts reported by CAGC.

85. Furthermore, because operating capital is very scarce in China, it is not the general business practice to provide suppliers with large cash advances. Yet, CAGC made huge cash advances to its suppliers for the future purchase of raw materials. As of December 31, 2009 and 2008, total cash advances made to the four suppliers amounted to $25.35 million and $10.8 million, respectively.

## V. CAGC'S STOCK PRICE DROPPED AS INVESTORS SLOWLY LEARNED THAT CAGC'S FINANCIAL STATEMENTS WERE INACCURATE

### A. The LM Report And Its Aftermath

86. On February 3, 2011, the research firm LM Research published a report asserting that China Agritech was a fraud.

87. The Report, asserted that the Company's financial statements were fraudulent. It alleged revenue was overstated and that the company's factory plants are idle.

88. The adverse news disclosed by the LM Report caused the Company's stock to decline from its closing price of $10.78/share on February 2, 2011 to

---

[18] Exchange rate for 2008 is RMB 6.9 : USD 1, for 2009 is RMB 6.8 : USD 1.

$9.12/share before closing at $9.85/share on February 3, 2011 —a day over day decline of 8.63%.

89.    The next day, CAGC vigorously denied the allegations made in the LM report. The response only helped recovery of the stock price by $0.14/share or 1%. Ironically, Charles Law, one of CAGC's Board of Directors, resigned on that day.

90.    CAGC continued to deny the allegations of fraud publicly.  Yet, as a result of the allegations of fraud, several analyst firms downgraded CAGC, causing a selloff and declines in its share price.

91.    On February 7, 2011, analyst firm Brean Murray downgraded CAGC. Also on February 7, 2011, YQV downgraded CAGC to hold and Rodman & Renshaw placed CAGC's rating under review as a result of the allegations of fraud in the LM Report.

92.    On February 8, 2011, analyst firm Chardan lowered its price target for CAGC from $8 to $5. And based on a lack of credibility in management rated CAGC a sell.

### B. The Bronte Report And Its Aftermath

93.    On February 15, 2011 Bronte Capital issued a scathing report presenting additional facts indicating that CAGC was a fraud and could not possibly have produced the revenue it claimed in its financial statements.

94.    As a result of the Bronte Capital report, CAGC stock price dropped from $9.21/share on February 5, 2011 to $7.44/share on February 16, 2011 – more than 19% - on extremely heavy volume.

### C. E & Y's Can No Longer Trust Management and Nasdaq Halts Trading in CAGC Stock

95.    A month later, on March 13, 2011, CAGC announced formation of a Special Committee of its Board of Directors ("the Special Committee") to investigate the allegations of fraud made by third parties.

96.    The next day CAGC dismissed Ernst & Young Hua Ming as the Company's independent auditor citing the following reasons as disclosed in the 8-K filed on March 13, 2011:

> "On November 13, 2010, China Agritech, Inc. (the "Company") appointed Ernst & Young Hua Ming ("E&Y") as its independent registered public accounting firm. On March 14, 2011, the Company terminated the services of E&Y.
>
> ...On December 15, 2010, E&Y provided a letter to the Audit Committee of the Board of Directors of the Company (the "Audit Committee") describing certain matters that, if not appropriately addressed in a timely manner, may result in audit adjustments, significant deficiencies or material weaknesses and/or delays in meeting the 10-K filing deadline. ... On March 8, 2011, E&Y informed the Audit Committee that it had encountered additional issues and concerns that, in E&Y's view, required additional information and procedures, **including the initiation of an independent investigation, in order to verify certain transactions and balances recorded on the Company's financial statements and records for the year ended December 31, 2010. E&Y also orally advised the Audit Committee that it may not be able to rely on management's representations based on the issues identified.**
>
> **E&Y informed the Company that the issues identified in performing their audit may, if further investigated, have adverse implications for the financial statements covering the three quarterly reports filed by the Company on Form 10-Q during 2010,** and advised the Audit Committee to inform the predecessor auditors of the issues identified, so that they can assess the impact on prior financial reports."

[Emphasis added]

97.    Thus, CAGC had concealed that E &Y had identified serious problems with its financial statements as early as December 15, 2010 and had informed CAGC's board that an internal investigation was necessary.[19] CAGC had misled

---

[19]  After retaining a law firm and accounting firm to conduct the investigation for more than four months, CAGC has still not disclosed the results of the investigation.

investors to believe that the investigation was not connected at all with E&Y's audit and concealed that E &Y had demanded the internal investigation as a result of serious issues with CAGC's financial statements. But CAGC failed to correct the problems with the financial statements, failed to provide verification for certain transactions – prompting "**E&Y ... orally advise[] the Audit Committee that it may not be able to rely on management's representations based on the issues identified."**

98.   Thus, the March 14, 2011 press release shocked investors by disclosing that Defendants had concealed that E&Y had insisted that the board commence an investigation and that Defendants had concealed that the failure of CAGC to file its 10-K timely was a result of accounting problems that E& Y had indentified back in December 2010 –leading to the investigation.  Thus, investors learned for the first time that E& Y had identified problems with CAGC's financial statements.  This news crushed any remaining credibility CAGC management had because E&Y stated it could not rely on management's representations.

99.   Also on March 14, 2011, the Nasdaq delisted and halted trading in CAGC stock with its share price at $6.88/share.

100.  Then, Defendant Wang, a member of the Company's Board of Directors, as well as a member of the special committee of the Board of Directors, resigned without a word.

101.  On May 20, 2011, CAGC stock opened for trading on the pink sheets at $1.50/share having dropped $5.38/share from its previous pre-halt trading price. CAGC shares traded as low as $1.00/share before closing for trading at $3.80/share. The next trading day, CAGC shares dropped another $0.80/share to $3.00/share on heavy trading.

102.  The share price decline on May 20 and 23 was a direct result of the negative news concerning E&Y disclosed on March14, 2011 and the resignation of

defendant Wang as a director, who had served as a representative of Carlyle – further eliminating any credibility for CAGC.

103.   CAGC shares currently are valued at $1.55/share as of June 21, 2011.

104.   Thus investors have seen the value of their shares drop from $10.78/share on February 2, 2011 when the fraud was first disclosed to $1.55/share as of June 21, 2011 – a loss of $9.23/share.

## VI.   ADDITIONAL FACTS SUGGESTIVE OF SCIENTER

### A.  Defendants' Stock Sales Demonstrate Scienter

105.   Defendants have also profited handsomely from sales of CAGC stock. This demonstrates that defendants had a strong profit motive to inflate the stock price by overstating its financials.

106.   CAGC filed a prospectus with the SEC on May 4, 2010 registering for sale large amounts of CAGC stock owned by Defendants.  While it is not clear exactly how much stock each defendants sold pursuant to the Registration Statement, Defendants were each motivated, and intended, to sell CAGC stock and earn tens of millions in profits.

107.   Scienter is also supported by fact that CAGC was able to conduct an equity offering to take advantage of CAGC stock's artificially inflated price. In May, 2010, CAGC sold over 1.243 million shares of its stock at $16.10/share raising approximately $21 million; along with the exercise of warrants, CAGC raised an additional $10 million.

108.   Defendants Teng, Tang and Zhu all profited handsomely from sales of CAGC stock during the period of the fraud.  A list of their specific CAGC share sales are as follows.

| Name | Position | Date | Amount | Proceeds |
|------|----------|------|--------|----------|
| Xiaorong Teng | Director/COO | 13-May-10 | 10,000 | $169,400 |
| | | 26-May-10 | 10,000 | $127,846 |

| | | | | |
|---|---|---|---|---|
| | | 01-Jun-10 | 7,200 | $92,835 |
| | | 23-Jul-10 | 31,900 | $384,921 |
| | | 26-Jul-10 | 20,000 | $251,064 |
| | | 10-Feb-11 | 100 | $1,294 |
| | | 11-Feb-11 | 11,668 | $151,149 |
| | | 12-Feb-11 | 8,232 | $106,856 |
| | | | **TOTAL** | **$1,285,364** |
| **Yau-Sing Tang** | CFO | 12-May-11 | 10,000 | $153,000 |
| | | 13-May-11 | 5,000 | $83,000 |
| | | 07-Jun-10 | 5,000 | $56,920 |
| | | 02-Aug-10 | 10,000 | $130,000 |
| | | 03-Aug-10 | 10,000 | $140,334 |
| | | 06-Aug-10 | 10,000 | $150,544 |
| | | 29-Dec-10 | 5,000 | $62,500 |
| | | 30-Dec-10 | 5,000 | $65,000 |
| | | 06-Jan-10 | 5,000 | $67,500 |
| | | | **TOTAL** | **$908,798** |
| **Mingfang Zhu** | COO | 18-May-10 | 1,900 | $29,640 |
| | | 19-May-10 | 28,100 | $363,033 |
| | | 27-May-10 | 20,000 | $260,208 |
| | | 04-Jun-10 | 20,000 | $240,290 |
| | | | **TOTAL** | **$893,172** |

### B.  CAGC's Misconduct Was So Serious that NASDAQ Delisted the Company's Securities from Trading

109.  CAGC's misconduct was evidently serious enough that on April 12, 2011, it received a letter from NASDAQ stating that:[20]

---

[20]  CAGC disclosed the letter in its 8-K filed with the SEC on April 18, 2011.

- "the staff of Nasdaq believes that the continued listing of the Company's securities on Nasdaq is no longer warranted based on public interest concerns and the Company's failure to file its 2010 Form 10-K on time (the "Nasdaq Letter").
- "the staff of Nasdaq believes **that the serious concerns raised by our former auditors, Ernst & Young Hua Ming ("E&Y"), relating to issues surfacing in the audit process rise to the level of a public interest concern**, . . . .

## C. The Revolving Door for CAGC's Auditors

110.  CAGC has changed auditors four times in three years. Since 2008, the Company has had four independent auditors.

111.  Kabani & company, Inc., ("Kabani") a Los Angeles-based accountancy, audited the Company's 2007 financials. Kabani was the accountancy that audited the notoriously fraudulent Bodisen Biotech, an organic fertilizer company that was delisted in 2007, and China Green Agriculture (CGA), a firm which was also disclosed having falsely reported its results to U.S. investors.

112.  In April 2008, CAGC terminated Kabani and retained Crowe Horwath LLP as its auditor. CAGC then terminated Crowe Horwath and retained E&Y in November, 2010.

113.  However, CAGC fired E&Y four months later due after E&Y identified issues in the 2009 audit, and stated it could no longer rely on representations of CAGC management.

114.  On April 12, 2011, CAGC announced it had hired Simon & Edward LLP as its new independent auditor to replace E & Y. Still, CAGC has not produced audited financial statements for fiscal year 2010.

**D. The SEC has Warned of Reverse Merger Companies Such as CAGC**

a.     Chinese reverse mergers have been a magnet for disreputable stock promoters, leading the SEC to issue warnings about investing in companies like CAGC.

b.     Shielded by the geographic distance of thousands of miles and operating under a regulatory framework that is a world apart from the SEC's oversight, RCM companies have few incentives to provide complete and accurate disclosures to American investors. An August 28, 2010 article in *Barron's* by Bill Alpert and Leslie P. Norton entitled, "Beware This Chinese Export," discusses the enforcement problems that American regulators face when dealing with Chinese companies that trade on U.S. exchanges through RCMs. The article states that "[t]he SEC's enforcement staff can't subpoena evidence of any fraudulent activities in China, and Chinese regulators have little incentive to monitor shares sold only in the U.S."

c.     U.S. regulators have finally begun to take notice of the manipulation and fraud endemic in RCMs. The SEC has recently established a task force to investigate investors' claims regarding the impropriety and fraud of RCMs trading on the U.S. markets.  SEC Commissioner Luis A. Aguilar (the "Commissioner") discussed Chinese reverse mergers and the process of "backdoor registration," stating:[21]

In the world of backdoor registrations to gain entry into the U.S. public market, the use by Chinese companies has raised some unique issues, even compared to mergers by U.S. companies. Two important ones are:

    •     First, there appear to be **systematic concerns with the quality of the auditing and financial reporting;** and

---

21 Text of the entire speech is available at http://sec.gov/news/speech/2011/spch040411laa.htm#P79_43025.

- Second, even though these companies are registered here in the U.S., there **are limitations on the ability to enforce the securities laws, and for investors to recover their losses when disclosures are found to be untrue, or even fraudulent**.

**I am worried by the systematic concerns surrounding the quality of the financial reporting by these companies**. In particular, according to a recent report by the staff of the Public Company Accounting Oversight Board (PCAOB), U.S. auditing firms may be issuing audit opinions on the financials, but not engaging in any of their own work. Instead, the U.S. firm may be issuing an opinion based almost entirely on work performed by Chinese audit firms. If this is true, it could appear that the U.S. audit firms are simply selling their name and PCAOB-registered status because they are not engaging in independent activity to confirm that the work they are relying on is of high quality. This is significant for a lot of reasons, including that the PCAOB has been prevented from inspecting audit firms in China.

d.    On June 9, 2011, the SEC issued an Investor Bulletin warning investors about investing in companies that enter U.S. markets through RCM "…there have been instances of fraud and other abuses involving reverse merger companies." "Given the potential risks, investors should be especially careful when considering investing in the stock of reverse merger companies," said Lori J. Schock, Director of the SEC's Office of Investor Education and Advocacy.

## VII.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

115.   Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased the common stock of CAGC during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the present and former officers and directors of CAGC and any subsidiary thereof, members of any defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

116.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CAGC's stock was actively traded on the NASDAQ at all times during the Class Period.

117.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds, if not thousands, of members in the proposed Class. Members of the Class may be identified from records maintained by CAGC or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

118.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

119.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

120.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.  whether the federal securities laws were violated by Defendants' acts as alleged herein;

    b.  whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, and financial performance of CAGC; and

    c.  to what extent the members of the Class have sustained damages and the proper measure of damages.

121.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members

may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII.   RELIANCE PRESUMPTION

122.   At all relevant times, the market for CAGC common stock was an efficient market for the following reasons, among others:

a. CAGC stock met the requirements for listing, and was listed and actively traded on the on the NASDAQ market (under ticker symbol "CAGC"), a highly efficient and automated market;

b. On average there were 18.8 million shares of the Company's common stock issued and outstanding during the Class Period. The public float (shares not held by insiders/defendants) was 10.5 million shares on average during the Class Period;

c. During the class period, on average, 4.4 million shares of CAGC common stock were traded on a weekly basis. Approximately 42.5% of the public float, and 23.5% of all outstanding shares, were bought and sold on a weekly basis, demonstrating a very strong presumption of an efficient market;

d. As a regulated issuer CAGC filed with the SEC periodic public reports and was eligible (and did file) S-3 registration statements with the SEC during the Class Period;

e. CAGC regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

f.  CAGC was followed by several securities analysts employed by major brokerage firms including Brean Murray, Rodman and Renshaw and Chardan (among others), who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period;

g.  At least 75 NASD member firms were active market-makers in CAGC stock at all times during the Class Period; and

h.  Unexpected material news about CAGC was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

## IX.   FIRST CAUSE OF ACTION

### Violation of Section 10(b) of The Exchange Act Against and Rule 10b-5 Promulgated Thereunder Against All Defendants But Excluding Rodman & Renshaw and Crowe Horwath

123.  Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

124.  This cause of action is asserted against all Defendants, except it specifically excludes Rodman & Renshaw and Crowe Horwath.

125.  During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase and/or sell CAGC's securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, individually and as a group, took the actions set forth herein.

126.  Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material

information about the business, operations and future prospects of CAGC as specified herein.

127. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CAGC's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about CAGC and its business operations and financial condition in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers CAGC securities during the Class Period.

128. Each of the defendants' primary liability, and controlling person liability, arises from the following: (a) defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (b) by virtue of their responsibilities and activities as senior officers and/or directors of the Company, were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) defendants enjoyed significant personal contact and familiarity with the other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and (d) defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

129. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such

facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CAGC's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' false and misleading statements during the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

130. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for CAGC's securities was artificially inflated during the Class Period.

131. In ignorance of the fact that market prices of CAGC's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired CAGC's securities during the Class Period at artificially high prices and were damaged thereby.

132. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding CAGC's financial results and condition, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired CAGC securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

133. By virtue of the foregoing, the defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

134. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

135. This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## X.   SECOND CAUSE OF ACTION
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

136. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

137. This Second Claim is asserted against each of the Individual Defendants, and it specifically excludes Rodman & Renshaw and Crowe Horwath.

138. The Individual Defendants, acted as controlling persons of CAGC within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's revenues and earnings and dissemination of information to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other

statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

139.   In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

140.   As set forth above, CAGC and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

141.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

142.   This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## XI.   THIRD CAUSE OF ACTION

### Violation of §11 of the Securities Act Against All Defendants

143.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is not based on, and does not allege, fraud.

144.   This §11 claim is asserted against all Defendants.

145. This claim is brought by Plaintiff Tan Tee Yong on his own behalf and on behalf of other members of the Class who acquired CAGC stock pursuant to or traceable to CAGC's Offering completed on and about May 4, 2010.

146. Each Class Member acquired his, her, or its shares pursuant to and/or traceable to, and in reliance on, the Registration Statement and Prospectus. CAGC is the issuer and Rodman & Renshaw is the Underwriter of the securities through the Registration Statement and Prospectus.

147. On April 29, 2010, the Company filed a Registration Statement and Prospectus with the SEC on form 424B5.[22]

148. The Prospectus incorporated by reference CAGC's false financial statements for fiscal years 2008 and 2009 that were contained in CAGC's 2008 and 2009 10-K.

149. The Prospectus contained the same false and misleading financial statements contained in CAGC's 2008 10-K and 2009 10-K as described above.

150. CAGC's 2008 and 2009 financial statements were materially false for the reasons set forth above.

151. The Individual Defendants are signatories of the Registration Statement and Prospectus.

152. Each of the Defendants owed to the purchasers of the stock obtained through the Registration Statement and Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

153. None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the false financial statements contained in the

---

[22] The Prospectus was pursuant to CAGC's Registration Statement No. 333-164810 filed with, and declared effective by, the SEC.

Registration Statement and Prospectus were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

154.   Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public that were contained in the Registration Statement and Prospectus, which misrepresented or failed to disclose, among other things, the challenged facts set forth above.   By reason of the conduct alleged herein, each defendant violated Section 11 of the Securities Act.

155.   CAGC is the issuer of the stock sold in the Offering via the Registration Statement and Prospectus.   As issuer of stock, the Company is strictly liable to Plaintiff and the Class for the material misstatements and omissions therein.

156.   Crowe audited and certified CAGC's financial statements for fiscal years 2008 and 2009 that were included in the Registration Statement and Prospectus for the Offering.

157.   Crowe certified and opined that CAGC's financial statements for 2008 and 2009 that were included in the Registration Statement and Prospectus were accurate and were prepared in accordance with GAAP, when in truth they were not.

158.   Rodman and Renshaw was the underwriter for the firm commitment underwriting of the Offering.

159.   At the time they purchased their shares of CAGC in the Offering, Plaintiff and members of the Class did so without knowledge of the true facts concerning the misstatements and omissions alleged herein.

160.   This action is brought within one year after discovery of the untrue statements and omissions in the Registration Statement and Prospectus that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement and Prospectus.

161.   By virtue of the foregoing, Plaintiffs and the other members of the class are entitled to damages under Section 11 as measured by the provisions of the Section 11(e), from the Defendants and each of them, jointly and severally.

## XII.   FOURTH CAUSE OF ACTION

### Violation of §15 of the Securities Act Against the Individual Defendants

162.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This claim is not based on, and does not allege, fraud.

163.   This claim is asserted against each of the Individual Defendants, each of whom was a control person of CAGC during the relevant time period.

164.   For the reasons set forth above and pursuant to the first and second claims, CAGC is liable to the plaintiffs and the members of the Class who purchased CAGC common stock in the Offering or pursuant and/or traceable to the Registration Statement based on the untrue statements and omissions of material fact contained in the Registration Statement and Prospectus, under §11 and §12(a)(2) of the Securities Act.

165.   The Individual Defendants were control persons of CAGC by virtue of, among other things, their positions as senior officers, directors and/or controlling shareholders of the Company.  Each was in a position to control and did in fact control CAGC and the false and misleading statements and omissions contained in the Registration Statement and Prospectus

166.   None of the Individual Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were accurate and complete in all material respects.  Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

167.   This claim was brought within one year after the discovery of the untrue statements and omissions in the Registration Statement and Prospectus and within three years after CAGC common stock was sold to the Class in connection with the Offering.

168.   By reason of the misconduct alleged herein, for which CAGC is primarily liable, as set forth above, the Individual Defendants are jointly and severally liable with and to the same extent as CAGC pursuant to Section 15 of the Securities Act.

## XIII.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a.   Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

b.   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action; and

d.   Such other and further relief as the Court may deem just and proper.

Dated: June 22, 2011

Respectfully submitted,
**THE ROSEN LAW FIRM, P.A.**

_Laurence Rosen_

Laurence M. Rosen, Esq. (CSB#219683)
333 South Grand Avenue, 25th Floor
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
lrosen@rosenlegal.com

Attorneys for Plaintiffs

**CERTIFICATION**

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against China Agritech, Inc. ("CAGC"), and certain of its officers and directors. The Rosen Law Firm, P.A. agrees to prosecute the action on a contingent fee basis not to exceed one-third of any recovery and will advance all costs and expenses. Any legal fees and expenses will be determined by, and payable, only upon order of the U.S. District Court.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      I have reviewed the complaint against CAGC and certain of its officers and directors and I retain the Rosen Law Firm, P.A. as counsel in this action for all purposes.

2.      I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the purchases and sales I have made in CAGC securities during the class period set forth in the complaint. I have made no transactions during the class period in the debt or equity securities that are the subject of this lawsuit except those set forth below.

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| 5,000 | April 21 2010 | $20.37964 | | $ |
| 5,000 | May 3, 2010 | $16.10 | | $ |
| | | $ | | $ |
| 2,000 | | $ | May 6, 2010 | $ 15.87 |
| 8,000 | | $ | July 7, 2010 | $ 10.60 |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

5.      I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):



6.      I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th day of June, 2011.



Signature: _____  16/06/2011
Name:      Tan Tee Yong

**REDACTED**

Item. 4 (continue from prior page if needed)

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

2

· EX-10.5 6 v149004_ex10-5.htm

Exhibit 10.5

*Unofficial English Translation*

Industrial Product Purchase Contract

| Seller: Shenzhen Hongchou Technology Company | |
|---|---|
| Buyer: Pacific Dragon Fertilizer Co., Ltd. | Contract No. 090005<br>Signing Location: Harbin<br>Signing Date: December 8, 2008 |

Article 1

Products, Numbers, Prices and Delivery (Obtaining) Time:

| Product | License No.<br><br>Trademark | Specs<br><br>Type | Production Company | Unit of Measurement | Number | Price/ Unit | Amount | Delivery (Obtaining) Time and Number | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Total | | | | |
| Potassium Phosphate Monobasic | | | | Ton | 1800 | 8,150.00 | 14,670,000.00 | | | | | |
| Sodium Hydroxide | | | | Ton | 4400 | 2800.00 | 12,320,000.00 | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | 26,990,000.00 | | | | | |
| Total Amount: RMB Twenty-six million, nine hundred and ninety thousand | | | | | | | | | | | | |

Article 2

Standards of the Quality: National standard

Article 3

Periods and Conditions for Sellers to Be Responsible for Quality Standards: Three months.

Article 4

Standards of Packages, Supplies and Recycling of Packing Materials: None

Article 5

Necessary Items and Accessories to Products, Numbers of Tools and Supply Methods: None

Article 6

Standards and Calculations of Reasonable Losses: 1%

Article 7

The ownership of the product is transferred when it is out of the seller's hands; however, if the buyer breaches its obligation of the payment, the ownership of the product shall belong to the seller.

Article 8
Methods and Locations of Delivery (Obtaining) of Products: <u>Deliver the product to the location designated by the buyer.</u>

Article 9
Methods, Arrival Stations (Harbors) and Expenses of Transportation: <u>The seller is responsible for all of the matters.</u>

Article 10
Standards, Methods, Locations and Periods of Inspections: <u>Conduct the on site inspection. It is deemed qualified if no comments raised after three days.</u>

Article 11
Installations and Adjustments of Whole Set of Equipments: <u>None</u>

Article 12
Methods, Time and Locations of Payments: <u>Prepay 15% of the total amount. The rest of the payment is paid off upon the arrival of the product.</u>

Article 13
Guarantees (or a separate guarantee agreement): <u>None</u>

Article 14
Conditions of Cancellation of Contract: <u>Negotiated by both parties.</u>

Article 15
Breaches: <u>The breaching parties shall be liable for losses.</u>

Article 16
Dispute Resolutions: Any dispute arising from and in connection with the contract may be negotiated by both parties, or mediated by the local administration of industry and commerce. In the event that an agreement cannot be reached, the dispute shall be resolved according to <u>(2)</u> of the followings:
(1) Submit to Arbitration Commission.
(2) File a law suit to the People's Court.

Article 17
The contract becomes effective from <u>December 8, 2008.</u>

2

Article 18
Other matters: <u>To be discussed.</u>

| Seller | Buyer | Certified Opinion |
|---|---|---|
| Name: Shenzhen Hongchou Technology Company<br>Address:<br>/s/ Wang Ying<br>Legal Representative: Wang Ying<br>ID No.<br><br>Entrusted Person:<br>Phone:<br>Deposit Bank:<br>Account No.:<br>Zip Code: | Name: Pacific Dragon Fertilizer Co., Ltd.<br>Address:<br>/s/ Chen Xiujuan<br>Legal Representative: Chen Xiujuan<br>ID No.<br><br>Entrusted Person:<br>Phone:<br>Deposit Bank:<br>Account No.:<br>Zip Code: | <br><br><br><br>Certified Agency:<br>Clerk: |

Effective Date: from December 8, 2008 to December 8, 2010

The sample contract is supervised and printed by Heilongjiang Administration of Industry and Commerce

3

· EX-10.3 4 v149004_ex10-3.htm

Exhibit 10.3

Unofficial English Translation

Industrial Product Purchase Contract

| Seller: Beijing Zhongxin Chemical Development Company | |
|---|---|
| Buyer: Pacific Dragon Fertilizer Co., Ltd. | Contract No. 090001<br>Signing Location: Harbin<br>Signing Date: December 2, 2008 |

Article 1
Products, Numbers, Prices and Delivery (Obtaining) Time:

| Product | License No. | Specs | Production Company | Unit of Measurement | Number | Price/ Unit | Amount | Delivery (Obtaining) Time and Number | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Type | | | | | | Total | | | | |
| | Trademark | | | | | | | | | | | |
| Special Type Fulvic Acid | | | | Ton | 6545 | 9,100.00 | 59,559,500.00 | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

Total Amount: RMB Fifty-nine million, five hundred and fifty-nine thousand and five hundred

Article 2
Standards of the Quality: National standard

Article 3
Periods and Conditions for Sellers to Be Responsible for Quality Standards: Within two months upon the arrival of the product.

Article 4
Standards of Packages, Supplies and Recycling of Packing Materials: None

Article 5
Necessary Items and Accessories to Products, Numbers of Tools and Supply Methods: None

Article 6
Standards and Calculations of Reasonable Losses: 1%

Article 7
The ownership of the product is transferred when it is out of the seller's hands; however, if the buyer breaches its obligation of the payment, the ownership of the product shall belong to the seller.

Article 8
Methods and Locations of Delivery (Obtaining) of Products: Deliver the product to the location designated by the buyer.

Article 9
Methods, Arrival Stations (Harbors) and Expenses of Transportation: Railroad Transportation. The seller is responsible for all of the transportation expenses.

Article 10
Standards, Methods, Locations and Periods of Inspections: Conduct the on site inspection after the arrival of the product. The period is seven days.

Article 11
Installations and Adjustments of Whole Set of Equipments: None

Article 12
Methods, Time and Locations of Payments: Prepay 33% of the total amount. The rest of the payment is paid off upon the arrival of the product.

Article 13
Guarantees (or a separate guarantee agreement): None

Article 14
Conditions of Cancellation of Contract: Voluntarily and mutually negotiated by both parties.

Article 15
Breaches: The breaching parties shall be liable for losses.

Article 16
Dispute Resolutions: Any dispute arising from and in connection with the contract may be negotiated by both parties, or mediated by the local administration of industry and commerce. In the event that an agreement cannot be reached, the dispute shall be resolved according to (2) of the followings:
(1) Submit to Arbitration Commission.
(2) File a law suit to the People's Court.

Article 17
The contract becomes effective from December 2, 2008.

2

Article 18
Other matters: <u>To be discussed.</u>

| Seller<br>Name: Beijing Zhongxin Chemical<br>Development Company<br>Address:<br>/s/ Liu Quan<br>Legal Representative: Liu Quan<br>ID No. | Buyer<br>Name: Pacific Dragon Fertilizer Co., Ltd.<br>Address:<br>/s/ Chen Xiujuan<br>Legal Representative: Chen Xiujuan<br>ID No. | Certified Opinion |
| --- | --- | --- |
| Entrusted Person:<br>Phone:<br>Deposit Bank:<br>Account No.:<br>Zip Code: | Entrusted Person:<br>Phone:<br>Deposit Bank:<br>Account No.:<br>Zip Code: | Certified Agency:<br>Clerk: |

Effective Date: from December 2, 2008 to December 2, 2010

The sample contract is supervised and printed by Heilongjiang Administration of Industry and Commerce

3

· EX-10.4 5 v149004_ex10-4.htm

Exhibit 10.4

*Unofficial English Translation*

Industrial Product Purchase Contract

| Seller: Harbin Hai Heng Chemical Distribution Co., Ltd.  Buyer: Pacific Dragon Fertilizer Co., Ltd. | |
|---|---|
| | Contract No. 090003  Signing Location: Harbin  Signing Date: December 5, 2008 |

Article 1
Products, Numbers, Prices and Delivery (Obtaining) Time:

| Product | License No. Trademark | Specs Type | Production Company | Unit of Measurement | Number | Price/ Unit | Amount | Delivery (Obtaining) Time and Number | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Total | | | | |
| Humic Acid | | | | Ton | 10855 | 4000 | 43,420,000.00 | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Total Amount: RMB Forty-three million, four hundred and twenty thousand | | | | | | | | | | | | |

Article 2
Standards of the Quality: <u>National standard</u>

Article 3
Periods and Conditions for Sellers to Be Responsible for Quality Standards: <u>Three months</u>.

Article 4
Standards of Packages, Supplies and Recycling of Packing Materials: <u>None</u>

Article 5
Necessary Items and Accessories to Products, Numbers of Tools and Supply Methods: <u>None</u>

Article 6
Standards and Calculations of Reasonable Losses: <u>1%</u>

Article 7
The ownership of the product is transferred when it <u>is out of the seller's hands</u>; however, if the buyer breaches its obligation of the payment, the ownership of the product shall belong to <u>the seller.</u>

Article 8
Methods and Locations of Delivery (Obtaining) of Products: <u>Deliver the product to the location designated by the buyer.</u>

Article 9
Methods, Arrival Stations (Harbors) and Expenses of Transportation: <u>The seller is responsible for all of the matters.</u>

Article 10
Standards, Methods, Locations and Periods of Inspections: <u>It is deemed qualified if no comments raised after seven days upon the arrival of the product.</u>

Article 11
Installations and Adjustments of Whole Set of Equipments: <u>None</u>

Article 12
Methods, Time and Locations of Payments: <u>Prepay 40% of the total amount. The rest of the payment is paid off upon the arrival of the product.</u>

Article 13
Guarantees (or a separate guarantee agreement): <u>None</u>

Article 14
Conditions of Cancellation of Contract: <u>Negotiated by both parties.</u>

Article 15
Breaches: <u>The breaching parties shall be liable for losses.</u>

Article 16
Dispute Resolutions: Any dispute arising from and in connection with the contract may be negotiated by both parties, or mediated by the local administration of industry and commerce. In the event that an agreement cannot be reached, the dispute shall be resolved according to <u>(2)</u> of the followings:
(1) Submit to Arbitration Commission.
(2) File a law suit to the People's Court.

Article 17
The contract becomes effective from <u>December 5, 2008.</u>

2

Article 18

Other matters: <u>To be discussed.</u>

| Seller | Buyer | Certified Opinion |
|---|---|---|
| Name: Harbin Hai Heng Chemical Distribution Co., Ltd. Address: /s/ Legal Representative: ID No. | Name: Pacific Dragon Fertilizer Co., Ltd. Address: /s/ Chen Xiujuan Legal Representative: Chen Xiujuan ID No. | |
| Entrusted Person: Phone: Deposit Bank: Account No.: Zip Code: | Entrusted Person: Phone: Deposit Bank: Account No.: Zip Code: | Certified Agency: Clerk: |

Effective Date: from December 5, 2008 to December 5, 2010

The sample contract is supervised and printed by Heilongjiang Administration of Industry and Commerce

3